UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATRINA L. GRIFFIN,                         Civil Action No. 15-13715

     Plaintiff,                         HON. MARIANNE O. BATTANI
                                          U.S. District Judge
v.                                          HON. R.  STEVEN WHALEN
                                          U.S. Magistrate Judge

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.
_____/

## REPORT AND RECOMMENDATION

    Plaintiff Catrina L. Griffin ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below,  I recommend that Defendant's motion for summary judgment be GRANTED and that Plaintiff's motion be DENIED.

## I.  PROCEDURAL HISTORY

    On May 28, 2008, Plaintiff filed  applications for SSI and DIB, alleging disability as of December 18, 2007 (Tr. 340-342, 343-347).  After the initial denial of the claim, she

requested an administrative hearing, held on March 15, 2010 in Detroit, Michigan before Administrative Law Judge ("ALJ") Michael F. Wilenkin (Tr. 62-97). On April 26, 2010, ALJ Wilenkin found Plaintiff not disabled (Tr. 107-117). On May 18, 2011, the Appeals Council remanded the case to the administrative level for (1) discussion of a treating physician's opinion, (2) an explanation for the physical limitations in the Residual Functional Capacity ("RFC") and, (3) discussion of the condition of obesity (Tr. 122-124).

Upon remand, ALJ Myriam C. Fernandez Rice held a hearing on September 21, 2011 (Tr. 42-61). On December 1, 2011, she found Plaintiff not disabled (Tr. 129-140). On July 10, 2013, the Appeals Council again remanded the case, this time on the following bases (1) ALJ Rice failed to address the treating physician's opinion cited in the first remand order, (2) a subsequent claim for benefits contained a psychological consultative examination report relevant to current claim, (3) ALJ Rice erroneously stated that Plaintiff did not visit a neurologist between 2006 and 2011 while in fact, Plaintiff had undergone a February, 2009 surgical procedure, (4) newer evidence showing Plaintiff underwent a surgical procedure in March, 2012 and, (5) a January, 2012 treating opinion of disability should be considered (Tr. 147-149).

On February 26, 2014, ALJ Oksana Xenos presided at a third hearing (Tr. 23-40). Plaintiff, represented by attorney Lisa Watkinson, testified (Tr. 26-37), as did Vocational Expert ("VE") Pauline McEachin (Tr. 37-40). On March 28, 2014, ALJ Xenos found that Plaintiff was not disabled (Tr. 169-184). On September 8, 2015, the Appeals Council denied

review (Tr. 1-6).  Plaintiff filed for judicial review of the Commissioner's decision on October 20, 2015.

## II.  BACKGROUND FACTS

Plaintiff, born August 7, 1969, was 44 when the ALJ issued her decision (Tr. 184, 340).  She completed high school (Tr. 405) and worked previously as a floral assistant, food servicer, housekeeper, security guard, and teacher's aid (Tr. 401).  Her application for benefits alleges disability as a result of a spinal injury and hypertension (Tr. 400).

### A.    Plaintiff's Testimony[1]

Plaintiff offered the following testimony:

She was left-handed, stood 5' 2.5" and weighed around 225 pounds (Tr. 26).  She currently lived with her children and her uncle (Tr. 27).  She required the use of a cane "at all times" (Tr. 27).  She stopped working in 2007 due to right arm pain (Tr. 27).  She had not attempted to find another job (Tr. 28).  At present, she was unable to work because she slept "a lot" and was "drowsy and dizzy all the time" due to medication side effects (Tr. 28).  She watched television around three hours a day, read magazines, and was able to prepare two "easy meals" each day (Tr. 29).  She relied on her care provider to do laundry, shop, perform household chores, and cook (Tr. 29).

Plaintiff preferred to be alone, but was able to interact with others without conflict

---

[1] While Plaintiff's earlier hearing testimony has been reviewed, the present discussion is limited to the February 26, 2014 hearing.

(Tr. 29).  She was able to sit for 45 minutes or stand for 30 without requiring a position change (Tr. 30).  She was unable to lift even five pounds due to right-side Carpal Tunnel Syndrome ("CTS") (Tr. 30).  She did not experience left-side symptoms (Tr. 30).  She did not drive or take buses (Tr. 29-30).  She seldom attended church, did not entertain, and did not eat at restaurants (Tr. 30).  She did not smoke, drink alcohol, or use illicit drugs (Tr. 31). The oldest child living with her was 24 (Tr. 31).

Plaintiff's daily headaches were relieved with medication (Tr. 31-32).  She experienced problems walking due to nerve damage in her right leg (Tr. 32).  She had recently been advised to have her gallbladder removed due to gallstones (Tr. 32).

In response to questioning by her attorney, Plaintiff noted that her right hand brace had been prescribed by a neurologist (Tr. 33).  Symptoms of CTS included "tingling, numbness [and] a pinching sensation" (Tr. 33).  She used a back brace for pain and stiffness (Tr. 33-34).  She took both pain medication and psychotropic drugs (Tr. 34).  She reiterated that she experienced the side effects of dizziness and drowsiness (Tr. 34).  Her pain medicine, prescribed by a pain management doctor, reduced her pain to level "3" on a scale of 1 to 10 (Tr. 35).  In addition to neurological treatment, Plaintiff received psychological treatment for depression (Tr. 36).  The depression was characterized by sadness and crying spells occurring around once a week (Tr. 36).  Plaintiff also experienced memory problems which caused her to misplace objects (Tr. 36-37).  She spent most of the day reclining in bed (Tr. 37).

### B.      Medical Evidence

### 1. Treating Sources

In December, 2007, Plaintiff sought treatment for shoulder pain (Tr. 541). Imaging studies of the cervical spine showing spur formation and narrowing of the neural foramina were consistent with Plaintiff's report of muscle spasm (Tr. 540). Imaging studies of the right shoulder were unremarkable (Tr. 539). January, 2008 imaging studies of the right wrist were normal (Tr. 535). February, 2008 nerve conduction studies of the upper right extremity were wholly unremarkable (Tr. 529). An MRI of the cervical spine showed disc herniations at C4-C5, and C5-C6 causing severe neural foramina narrowing (Tr. 524, 526). A July, 2008 CT of the cervical spine showed disc protrusions at C4-C5 and C5-C6 (Tr. 524). An x-ray of the cervical spine from the same month showed only mild degenerative changes at C5-C6 (Tr. 522). Records from the following month reference Plaintiff's ongoing radiculopathy and upcoming laminectomy (Tr. 530). Treating records by Latisha Malcom, M.D. note no acute distress (Tr. 592).

May, 2008 records by neurologist Hazem Eltahawy, M.D. note a limited range of neck motion (Tr. 581). He prescribed a neck collar for temporary use until surgery (Tr. 582). Plaintiff denied the use of street drugs but reported drinking occasionally and smoking three cigars a day (Tr. 581). She demonstrated 5/5 strength in all muscle groups except for 4/5 right hand grip and shoulder and hip flexion (Tr. 581). In September, 2008, neurologist Hazem Eltahawy, M.D. found that Plaintiff would be unable to lift more than 20 pounds (Tr.

576).

In November, 2008, Dr. Eltahawy found that Plaintiff was limited to lifting less than 10 pounds and walking for less than two hours in an eight-hour workday (Tr. 554). He found that Plaintiff was unable to sit for even six hours in an eight-hour workday (Tr. 555). He declined to find that Plaintiff required a cane, but found that she was unable to perform any postural activities and was limited to occasional reaching, handling, and fingering (Tr. 555). The same month, Dr. Eltahawy, noting that Plaintiff was pursuing a disability claim, declined to write an "off-work" note, but offered to complete paperwork stating that she would be a candidate for temporary disability until up to eight weeks after surgery (Tr. 573).

November, 2008 psychological intake records note Plaintiff's report of depression (Tr. 642). The intake records note that Plaintiff was "encouraged" to seek psychological treatment "by [the] attorney working on appeal of SSDI denial" (Tr. 636, 639, 1174). Plaintiff appeared alert, logical, and fully oriented (Tr. 634). She reported that she got along well with her uncle, son, and three daughters (Tr. 628). She was assigned a GAF of 41 to 50 based on depression, nicotine dependence, and "multiple medical . . . and legal issues" with a good prognosis[2] (Tr. 628, 637). The same month, Dr. Datia Raju completed an assessment

---

[2]

 A GAF score of 41 to 50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job." *Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (4th ed.2000)("*DSM-IV-TR*"), 34.

of Plaintiff's work-related activities, finding that her ability to follow rules, relate to others, use judgment, and function independently was fair, but ability to maintain attention and deal with stress was poor (Tr. 600). Dr. Raju found that Plaintiff's ability to understand, remember, and carry out simple instructions was good (Tr. 601) and her ability to maintain stability and act predictably in social situations was fair (Tr. 601). Mental health records from the following month state that Plaintiff appeared fully oriented with a "neat appearance with calm affect" (Tr. 613). Treating records note that she had a "good relationship" with family members including talking to her siblings daily and taking her children on outings (Tr. 613).

January, 2009 mental health records state that Plaintiff appeared alert, neat, clean, and cooperative with "no formal thought disorder" (Tr. 607). She appeared fully oriented (Tr. 607). In February, 2009, Dr. Eltahawy performed C5-C7 fusion surgery without complications (Tr. 557, 1222). She was advised to walk frequently (Tr. 558). The same month Douglas Merenda, R.N., noted that Plaintiff "voiced no physical complaints" during physical therapy (Tr. 606).

Dr. Eltahawy's May, 2009 notes state that Plaintiff had gained weight and continued to smoke cigars (Tr. 567). She walked with a cane, but reported that the earlier surgery had improved her neck condition (Tr. 567). Imaging studies were negative for surgical complications (Tr. 598). A June, 2009 MRI showed a protrusion at C5-C6 without other significant abnormalities (Tr. 596, 1208). Mental health records from the same month state

that Plaintiff felt frustrated and overwhelmed taking care of her uncle and three younger children (Tr. 605). In August, 2009, Dr. Eltahawy examined Plaintiff, noting that she "recovered well" from the February, 2009 procedure (Tr. 565). Plaintiff reported lower back, right arm, and left leg pain for which she took Vicodin ES twice a day (Tr. 565). Dr. Eltahawy advised Plaintiff to lose weight to reduce joint stress (Tr. 565). Plaintiff reported that she required a cane for ambulation (Tr. 566). The following month, Dr. Malcom noted a wholly unremarkable physical examination (Tr. 584-586, 649).

November, 2009 mental health records state that Plaintiff currently took Cymbalta and Elavil for depression (Tr. 621). Dr. Eltahawy's December, 2009 records note Plaintiff's report of lower back and extremity pain despite imaging studies showing at most mildly abnormal findings (Tr. 602). Dr. Eltahawy found that Plaintiff was limited to lifting 10 pounds (Tr. 1217). Mental health notes from the same month state that Plaintiff denied physical complaints (Tr. 604). Dr. Malcolm's January, 2010 records state that Plaintiff denied headaches or fatigue (Tr. 646). A March, 2010 MRI of the lumbar spine showed a mild disc herniation at L3-L4 with "possible" compression of the left L5 nerve (Tr. 652, 1206). A physical examination was normal (Tr. 800). August and November, 2010 and April, 2011 mental health care records note that Plaintiff goals were maintaining a stable mood, losing weight, and performing household chores for 20 minutes twice a day (Tr. 769, 776, 778).

In September, 2010, Dr. Eltahawy referred Plaintiff for pain management treatment

-8-

(Tr. 737). Plaintiff characterized her lower back pain as a "9" (Tr. 737). She reported that she required a cane for walking (Tr. 738). She admitted to occasional marijuana use (Tr. 738). Plaintiff exhibited full strength in all extremities, a normal gait, good judgment, and a normal thought content, mood, and affect (Tr. 738). She was prescribed Vicodin ES and Flexeril (Tr. 739). November and December, 2010 epidural steroid injections were administered without complications (Tr. 733-735, 1255-1257). Plaintiff reported that the injections improved her condition by 50 percent (Tr. 733).

In January, 2011, Plaintiff reported leg swelling and weight gain, but noted that a pregnancy test was negative (Tr. 669-683, 730). Her weight gain was deemed attributable to the steroid injections (Tr. 726). She exhibited 5/5 strength in all extremities and a normal mood (Tr. 728). She denied anxiety or depression (Tr. 731). Dr. Malcolm's notes from the following month state that Plaintiff was fully oriented with normal motor skills (Tr. 792, 1269). In March, 2011, Plaintiff reported that pain interfered with her daily activities but was eased with medication (Tr. 722). She denied medication side effects (Tr. 722). An EKG was normal (Tr. 807). Mental health records by Susan Lint-Pirtle, P.A. state that Plaintiff experienced depression but exhibited a calm and logical effect (Tr. 865-866). The following month, a medication dosage was reduced after Plaintiff reported the side effect of drowsiness (Tr. 719, 721).

May, 2011 records state that Plaintiff exhibited normal concentrational abilities (Tr. 717). Neurologist David S. Hong, M.D. advised Plaintiff to lose weight (Tr. 759). The same

-9-

month and in June, 2011, a medial branch block was performed without complications (Tr. 713). June, 2011 therapy discharge records show improvement in posture but none in pain relief (Tr. 692). The following month, Plaintiff sought emergency treatment for neck and back pain (Tr. 693). Followup records note a normal mood and affect (Tr. 694, 708). Imaging studies of the cervical spine were unremarkable (Tr. 697, 745). An MRI of the lumbar spine was unchanged from the previous study (Tr. 699). Dr. Eltahawy advised Plaintiff to continue conservative treatment (Tr. 783). A CT of the cervical spine was also unremarkable (Tr. 701). Plaintiff denied concentration or memory problems and exhibited a normal mood and affect (Tr. 708-709).

Also in July, 2011, P.A. Lint-Pirtle completed an assessment of Plaintiff's work-related abilities, finding that her ability to relate to co-workers, the public, and supervisors was "poor" (Tr. 741). Lint-Pirtle found that Plaintiff was "easily irritable," depressed, and "drowsy throughout the day" (Tr. 741). She found that the ability to behave in a stable, predictable, reliable manner was poor (Tr. 742).

In August, 2011, Dr. Eltahawy noted that lumbar surgery was an option, but advised Plaintiff to lose weight before prior to surgery (Tr. 747). The following month, Plaintiff demonstrated a normal range of spine motion (Tr. 992). In December, 2011, P.A. Lint-Pirtle found that Plaintiff experienced marked limitation in the ability to carry out detailed instructions, maintain attention, and complete a normal workweek without psychological interruptions (Tr. 867-868). Pain clinic records from the same month note full strength, a

-10-


normal range of spine motion, and a normal mood and affect (Tr. 982). Dr. Malcolm's treating notes state that Plaintiff was upset over a recent denial of SSI (Tr. 1055).

In January, 2012 Dr. Malcom composed a letter on behalf of Plaintiff's application for benefits, stating that due to side effects from multiple medications and "mood altering" psychotropic medications, Plaintiff was unable to work (Tr. 814). The same month, P.A. Lint-Pirtle's medication review notes state that Plaintiff was upset about being denied SSI (Tr. 1099). P.A. Lint-Pirtle submitted a report to the State of Michigan, noting that Plaintiff experienced chronic pain and the medication side effects of drowsiness and fatigue from pain and psychotropic medications (Tr. 863). Dr. Eltahawy noted Plaintiff's allegation that she was unable to work "due to the combination of the 13 medications she is taking" (Tr. 1038-1039). In March, 2012, Dr. Eltahawy performed a lumbar disectomy without complications (Tr. 811, 815-849). He noted that Plaintiff's depression was well controlled with medication (Tr. 1032). April, 2012 pain clinic records note that Plaintiff was receiving pain medication from multiple providers (Tr. 975). Dr. Eltahawy noted that Plaintiff's reported pain was "unusual" (Tr. 1030). May, 2012 physical therapy records state that Plaintiff was able to recall three of three back exercise precautions without prompting (Tr. 934). June, 2012 records note that Plaintiff's condition improved aside from continued L4-L5 radiculopathy (Tr. 813, 931). In September, 2012, Plaintiff reported that she was able to complete errands and get in and out of a vehicle (Tr. 1015). December, 2012 and January, 2013 physical therapy records show a decrease in pain (Tr. 908, 913-914, 918, 920). December, 2012 x-

rays show that the lumbar spine was stable (Tr. 1009).  Her ability to climb stairs and stand and sit for extended periods improved (Tr. 917).  April, 2013 pain clinic records state that Plaintiff had "a history of narcotic prescriptions from multiple doctors" (Tr. 955).

May, 2013 physical therapy records state that Plaintiff's condition continued to improve (Tr. 906).  Pain clinic records state that she experienced level "3" pain on exertion but "rare[]" with daily activities (Tr. 949).  Notes from the following month state that she was fully oriented (Tr. 945).  In June, 2013, Plaintiff reported that she required the use of cane (Tr. 1000).  In August, 2013, she reported the side effect of drowsiness but no other complaints (Tr. 943).  The following month, she reported that she was independent in activities of daily living (Tr. 941).

In October, 2013, Plaintiff sought emergency treatment for a back injury while lifting boxes (Tr. 873, 880).   A neurological examination was unremarkable (Tr. 898).  She reported depression (Tr. 877). She was assigned a GAF of 70[3] (Tr. 882).  She appeared alert and oriented and was discharged in stable condition (Tr. 873, 875).  The same month, Dr. Malcom found that Plaintiff required assistance on a permanent basis for mobility, meal preparation, shopping, laundry, and housework (Tr. 870).  In November, 2013 pain clinic records state that Plaintiff reported the side effect of drowsiness but declined an offer to change her medication, stating that she  "like[d] her current regimen and [was] used to it and

---

[3]GAF scores in the range of 61-70 indicate "some mild [psychological] symptoms or some difficulty in social, occupational, or school functioning." *DSM-IV-TR* at 34.

-12-

d[id] not want to change anything" (Tr. 939).

In December, 2013, Dr. Eltahawy noted that Plaintiff was "on a multitude of pain meds" and was "unlikely able to return to [the] work force" (Tr. 996). He found that her abilities "would best be" determined through a functional capacity assessment (Tr. 996). He found that Plaintiff's condition would require her to take three to four unscheduled 30-minute work breaks over the course of an eight-hour workday and miss around five days of work each month (Tr. 1133). The following month, pain specialist S. Chakrabortty, M.D. found that Plaintiff would be required to take three or four unscheduled breaks each day, but declined to find that concentrational problems would prohibit full-time work (Tr. 1131). In May, 2014, Dr. Malcom found that Plaintiff was unable to perform "many activities of daily living without assistance" and due to "multiple medical conditions," was unable to "obtain [or] sustain gainful employment" (Tr. 1278).

## 2.   Non-Treating Sources

In September, 2008, Muhammad Mian, M.D. performed a non-examining residual functional capacity assessment on behalf of the SSA, finding that Plaintiff could lift 50 pounds occasionally and 25 frequently; sit, stand, or walk for a total of six hours in an eight-hour workday; and perform unlimited pushing and pulling (Tr. 546). Dr. Mian cited treating records noting 5/5 muscle strength in all extremities (Tr. 546). He noted Plaintiff's acknowledgment that she was able to care for her daughter, perform housekeeping tasks, take care of her own personal needs, take public transportation, and walk (Tr. 550).

-13-

In December, 2010, David L. Hayter, Ph.D. performed a consultative psychological examination on behalf of the SSA, noting Plaintiff's report of nerve damage due to a spinal injury and that she experienced depressive symptoms at the time of her physical diagnosis (Tr. 1260). Plaintiff reported that she got along with friends and neighbors (Tr. 1261). She stated that she performed household chores despite a physician's order to avoid lifting more than 10 pounds (Tr. 1261). Plaintiff exhibited normal motor activity but used a cane (Tr. 1261). Dr. Hayter noted that Plaintiff was alert and fully oriented (Tr. 1262). He noted that Plaintiff interacted appropriately and could "understand, retain and follow simple instructions" and perform "simple, routine, repetitive, concrete, tangible tasks" (Tr. 1263). He assigned her a GAF of 50 (Tr. 1263). In January, 2011, Zara Khademian, M.D. performed a non-examining review of the treating and consultative records, finding that Plaintiff experienced mild limitation in activities of daily living and social functioning and moderate limitation in concentration, persistence, or pace (Tr. 157). He found that she could perform "simple work" (Tr. 161).

### C. Vocational Expert Testimony

At the hearing, ALJ Xenos posed the following question to VE McEachin, describing a hypothetical individual of Plaintiff's age, education and work experience:

[C]an perform work at the sedentary exertional level,[4] cannot climb ladders,

---

[4]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or

ropes or scaffolds, can occasionally climb stairs and ramps, balance, stoop, kneel, crouch and crawl, should avoid hazards such as moving machinery, unprotected heights and vibration, is limited to simple routine tasks with minimal changes in the work setting and occasional contact with the general public, supervisors and co-workers. Can occasionally operate foot or leg controls, can frequently reach overhead and handle with the non-dominant right upper extremity and also requires a sit/stand at will option at the workstation. Are there any jobs available with that residual functional capacity? (Tr. 38).

Basing her testimony on the *Dictionary of Occupational Titles* ("*DOT*") and her own professional experience, the VE responded that given the above limitations, the individual could perform the sedentary, unskilled work of a surveillance system monitor (120,000 in the national economy); visual inspector (110,000); and packager (140,000) (Tr. 38). The VE added that the need for a cane for walking greater than 20 yards would not effect the job numbers (Tr. 38-39). She testified further that if the individual were limited to occasional handling and fingering in the right upper extremity, the packaging position would be eliminated but the surveillance system and visual inspector positions would not be affected (Tr. 39). The VE stated that if pain and other impairments caused the same individual to be "off task up to 20 percent of the workday," all competitive employment would be eliminated (Tr. 39).

---

carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

### D.  The ALJ's Decision

ALJ Xenos found that none of Plaintiff's former jobs rose to the level of "substantial gainful activity" as defined by the Social Security regulations (Tr. 183); 20 C.F.R. 404.1565. Citing the medical records, the ALJ found that Plaintiff experienced the "severe" impairments of "cervical myelopathy, degenerative disc disease, [CTS], neuropathy, hypertension, obesity, and depression" but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 172).  ALJ Xenos found that Plaintiff had mild restriction in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 173).  The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for sedentary work with the following limitations:

> [L]imited to simple, routine tasks with occasional contact with the general public, coworkers, and supervisors, and minimal changes in the work setting; cannot climb ladders, ropes, or scaffolds; can occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; can occasionally operate foot/leg controls; can frequently reach overhead; can occasionally handle and finger with the non-dominant right upper extremity; requires a sit/stand at will option at the workstation; requires a cane to ambulate distances greater than 20 yards; should avoid hazards, such as moving machinery and unprotected heights; and should avoid vibration (Tr. 174).

Citing the VE's job numbers, the ALJ determined that Plaintiff could perform the work of a surveillance systems monitor and visual inspector (Tr. 183).

The ALJ discounted the allegations of disability.  She cited Plaintiff's own report that she read, washed dishes, performed light housekeeping chores, shopped, used a laundry mat, took public transportation, paid bills, and used a checkbook or money orders (Tr. 173).  The

ALJ noted that Plaintiff had an interpersonal relationship lasting 23 years, got along well with others, and was dating as of 2010 (Tr. 173). She cited 2010 examination records showing appropriate interaction and that the condition of depression was well controlled (Tr. 180). The ALJ found Dr. Raju's November, 2008 disability opinion "internally inconsistent," noting that while Dr. Raju found that Plaintiff had "poor or no ability" to handle work stress and maintain concentration, she had a "good" ability to understand, remember, and carry out simple job tasks (Tr. 181).

### III.  STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative

-17-

record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V.  ANALYSIS

### A.  The ALJ's Analysis of the Treating Opinions

Plaintiff argues first that the ALJ erred by substituting her own judgment for that of

neurologist Dr. Eltahawy. *Plaintiff's Brief,* 7-16, *Docket #14,* Pg. ID 1344. Plaintiff notes that Dr. Eltahawy's opinion of disability is also supported by Dr. Malcolm's multiple disability opinions and Dr. Chakrabortty's finding that Plaintiff would require multiple unscheduled 30-minute breaks over the course of the workday. *Id.* at 12-13.

### 1. Basic Principles

"[I]f the opinion of the claimant's treating physician is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir.2009)(internal quotation marks omitted)(*citing Wilson v. CSS*, 378 F.3d 541, 544 (6th Cir.2004); 20 C.F.R. § 404.1527(c)(2)). However, in the presence of contradicting evidence, the ALJ may reject all or a portion of the treating source's findings, *see Warner v. Commissioner of Social Sec.*, 375 F.3d 387, 391-392 (6th Cir.2004), provided that he supplies "good reasons" for doing so. *Wilson*, at 547; 20 C.F.R. § 404.1527(c)(2). When according less than controlling weight to the treating physician opinion, the ALJ must consider (1) "the length of the ... relationship" (2) "frequency of examination," (3) "nature and extent of the treatment," (4) the "supportability of the opinion," (5) "consistency ... with the record as a whole," and, (6) "the specialization of the treating source." *Wilson*, at 544. An ALJ's partial or total rejection of a treating opinion must be supported by substantial evidence. *See Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. August 8, 2006)("the ALJ may not substitute his own medical judgment for that of the treating

-19-

physician where the opinion of the treating physician is supported by the medical evidence").

In addition, the ALJ must explain his reasons for according less than controlling weight to a treating opinion. The failure to articulate "good reasons" for rejecting a treating physician's opinion constitutes reversible error. *Gayheart v. CSS*, 710 F.3d 365, 376 (6th Cir.2013); *Wilson v. CSS,* 378 F.3d 541, 544–546 (6th Cir.2004)(citing § 404.1527(c)(2)). "[T]he Commissioner imposes on its decision-makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart*, at 376 (citing SSR 96–2p, 1996 WL 374188, *5 (July 2, 1996)).

## 2. The ALJ's Rationale for Rejecting the Treating Opinions

The ALJ acknowledged Dr. Eltahawy's December, 2013 opinion that Plaintiff would require multiple unscheduled breaks over the course of the workday, Dr. Chakrabortty's similar January, 2014 opinion, and Dr. Malcolm's multiple statements that Plaintiff was unable to work (Tr. 179). The ALJ noted that the sources were generally entitled to the deference accorded a treating physician and discussed the nature and length of the treating relationships (Tr. 175-180).

However, the ALJ found that the opinions were inconsistent with the medical evidence

of record showing improvement in upper extremity symptoms following the February, 2009 cervical surgery (Tr. 179). The ALJ noted that following the March, 2012 lumbar surgery, Plaintiff's pain was well controlled with medication (Tr. 179). The ALJ prefaced these findings with a four-page discussion of the medical records supporting the RFC for a limited range of sedentary work. The ALJ observed that the treating opinions stood at odds with the treating records, the clinical studies, and Plaintiff's activities of daily living (by her own account) which included washing dishes, performing light household chores, shopping, going to a laundry mat, and carrying for her uncle (Tr. 175-182).

### 3. The ALJ's Rejection of the Treating Opinions is Well-Supported and Explained

Consistent with the ALJ's determination, my own review of the 750-page medical transcript shows that Drs. Eltahawy, Malcom, and Chakrabortty's disability opinions are grossly at odds with the treating records. Dr. Eltahawy's September, 2008 finding that Plaintiff was limited to lifting 20 pounds exceeds the ALJ's RFC for sedentary work which requires at most, 10-pound lifting (Tr. 576). Although Dr. Eltahawy limited Plaintiff to less than 10 pounds lifting as of November, 2008, he declined to find that the limitations would last more than eight weeks after the February, 2009 cervical spine surgery (Tr. 573). None of the treating records post-dating the cervical procedure support the finding that Plaintiff was unable to lift up to 10 pounds as required for sedentary work.

In December, 2009 Dr. Eltahawy, noting that Plaintiff's reports of ongoing pain were supported by only mildly abnormal studies, found that she was capable of lifting 10 pounds

(Tr. 1217). Significantly, mental health records from the same month note that Plaintiff denied physical problems (Tr. 604). Dr. Eltahawy's September, 2010 and January, 2011 records note full muscle strength in all extremities (Tr. 728, 738). August, 2011 records note a normal range of motion (Tr. 992). While Plaintiff claimed that she required the constant use of a cane, October, 2013 records show that she was lifting boxes at the time of an injury (Tr. 898). A neurological examination was normal (Tr. 898). Despite Plaintiff's claim of disabling pain, she declined a November, 2013 offer to change her pain medication, stating that she "like[d] her curent regimen" (Tr. 939).

Dr. Malcolm's multiple statement that Plaintiff was disabled due to physical and mental impairments and medication side effects is flatly contradicted by her own treating records: no acute distress (August, 2008); unremarkable physical examination (September, 2009); no fatigue, normal physical examination (January, 2010); normal motor skills (February, 2011); no medication side effects (March, 2011); normal concentrational abilities (May, 2011); memory problems denied (June, 2011); normal motor function, alert, fully oriented, despite allegations of poor memory (December, 2011) (Tr. 584-586, 592, 646, 649, 708-709, 717, 722, 792, 800, 1053, 1056, 1269). Dr. Malcolm's January, 2012 opinion that Plaintiff was disabled due to medication side effects, based solely on Plaintiff's December, 2011 claim of grogginess, is undermined by numerous records showing a normal mood and effect (Tr. 814).

Plaintiff argues on a related note that the ALJ was also required to consider whether

-22-

she was disabled for at least a 12-month period between the alleged onset of disability date of December 18, 2007 through the March 28, 2014 decision. *Id.* at 9. Plaintiff is correct that the ALJ must consider whether a claimant experienced disability for any period of 12 months or more within the relevant time frame, even if the disability ended prior to the administrative determination. SSR 82-53, 1982 WL 31374, *5-6 (January 1, 1982). However, none of the medical records suggest that Plaintiff was unable to perform a limited range of sedentary work for a period of 12 months or more. Likewise, while Plaintiff takes issue with the finding that she could walk up to 20 yards without the use of a cane, numerous unremarkable neurological examinations and findings of full muscle strength, cited above, undermine her claim that she required the constant use of a cane.

Finally, Plaintiff's argument that the ALJ was obliged to order an additional consultative examination for assessment of the physical limitations is without merit, given that the majority of the 750-page medical transcript pertains to the physical conditions. "An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (citing 20 C.F.R. §§ 404.1517, 416.917) ("'If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests'"); *see also Landsaw v. HSS*, 803 F.2d 211, 214 (6th Cir. 1986)(ALJ authorized but not required to order additional testing "if the existing medical sources do not contain sufficient evidence to make

-23-

a determination"). Because the lengthy transcript contains an ample basis for crafting the RFC, ALJ Xenos was not obliged to order an additional examination.

Because the ALJ's rejection of the treating opinions is generously supported and well explained, a remand on this basis is not warranted.

### B.  The Mental Limitations

Plaintiff also argues that the RFC for "simple, routine tasks with occasional contact with the general public, coworkers, and supervisors, and minimal changes in the work setting" (Tr. 174) did not fully account for her moderate limitation in concentration, persistence, and pace as found by the ALJ.  *Plaintiff's Brief* at 16-20 (*citing Ealy v. CSS,* 594 F.3d 504, 517 (6th Cir. 2010)).

 Plaintiff's reliance on *Ealy* is not well taken.  While in that case, the Court found that the hypothetical limitations of "simple repetitive tasks" were insufficient to account for the claimant's moderate deficiencies in concentration,  *Ealy* does not hold that the terms  "simple and routine" are intrinsically inadequate to address moderate concentrational deficiencies. Rather, the Court found that the hypothetical limitations of "simple, repetitive" (drawn from a non-examining medical source) impermissibly truncated the same source's overall conclusion that the claimant should be limited to "simple repetitive tasks to '[two-hour] segments over an eight-hour day where speed was not critical.'" *Id.*, 594 F.3d at 516. The position that "simple and routine" or synonymous terms are always insufficient to address moderate concentrational deficiencies (even where the record does not support more stringent

limitations) reflects an erroneous reading of *Ealy*.   Instead, the evidence of record and the ALJ's opinion must be considered in their entirety in determining whether the hypothetical limitations adequately describe the claimant's limitations. *See Schalk v. CSS*, 2011 WL 4406824, *11 (E.D.Mich. August 30, 2011)(*citing Hess v. CSS,* 2008 WL 2478325, at *7 (E.D.Mich.June 16, 2008))("no bright-line rule" that moderate concentrational deficiencies require the inclusion of certain hypothetical limitations).

The current transcript does not require additional or more stringent modifiers to address Plaintiff's psychological limitations.   The record shows that in November, 2008, Plaintiff's counsel prompted her to seek mental health treatment after the initial denial of her disability claim[5] (Tr. 636, 639, 1174).   The intake records do not suggest concentrational difficulties. Plaintiff reported symptoms of depression but appeared alert, logical, and fully oriented (Tr. 634).   She  indicated that she enjoyed a good relationship with her family (Tr. 628).   She received a good prognosis (Tr. 628).   Dr. Raju found that Plaintiff's ability to understand, remember, and carry out simple instructions was good (Tr. 601).   While P.A. Lint-Pirtle opined in  2011 that Plaintiff's ability to relate to others and complete a normal workday was poor (Tr. 741-742, 867), the treating  records state otherwise: alert, neat, clean, cooperative, no thought disorder (January, 2009);good judgment, normal thought content, mood, and affect (September, 2010); normal mood (January, 2011); calm, logical affect (March, 2011); normal

---

[5]Plaintiff's application for benefits alleges only that she experienced spinal problems and hypertension (Tr. 400).

concentrational abilities (May-June, 2011)(Tr. 607, 708, 717, 728, 738, 865-866). Although Plaintiff alleged that the medication side effect of drowsiness prevented her from working, in November, 2013, she declined an offer to change her medication to one with a lesser degree of side effects (Tr. 939).

### C. The RFC

In her third argument, Plaintiff reiterates that the RFC does not account for her limitations resulting from the cervical spine condition and the need to use a cane. *Plaintiff's Brief* at 21-24. In support of this argument, Plaintiff cites July, 2011 records stating that she was unable to turn her head. *Id.* at 22 (*citing* Tr. 704). She also argues that the RFC does not account for her concentrational limitations stemming from medication side effects. *Id.* at 24.

### 1. Basic Principles

The RFC describes an individual's residual abilities. *Howard v. CSS*, 276 F.3d 235, 239 (6th Cir. 2002). "RFC is to be an 'assessment of [Plaintiff's] remaining capacity for work' once her limitations have been taken into account" *Id.* (citing 20 C.F.R. § 416.945). In determining a person's RFC, it is necessary to consider (1) objective medical evidence as well as (2) subjective evidence of pain or disability. 20 C.F.R. § 404.1545(a)(1)(RFC must be based on all "relevant evidence"). The RFC must consider the alleged physical, mental, and environmental restrictions. § 404.1545(b-d). However, the ALJ is not required to include the discounted findings in the RFC. *See Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 118–119 (6th Cir. 1994)(ALJ not obliged to credit rejected claims in question to VE

-26-

or by extension, in the ultimate RFC).

## 2.  The Neck Condition

The RFC crafted by the ALJ limits Plaintiff to lifting 10 pounds, with the manipulative limitations of occasional handling and fingering with the right upper extremity and the ability to reach overhead on a frequent (as opposed to *constant*) basis (Tr. 174).

The ALJ reasonably found that the medical transcript did not suggest the need for greater restrictions.[6]  Plaintiff reported in May, 2009 that the neck surgery had improved her condition (Tr. 567).  Mental health records from the next month state that Plaintiff was able to care for her uncle and three younger children (Tr. 605).  Dr. Eltahawy's August, 2009 examination notes state that Plaintiff had recovered well from the neck surgery (Tr. 565). Plaintiff denied physical complaints in December, 2009 (Tr. 604).  While Plaintiff sought emergency treatment for neck pain in July, 2011, a CT was unremarkable and Dr. Eltahawy recommended continued conservative treatment (Tr. 701, 783).  His June, 2012 records state that Plaintiff's condition continued to improve despite some degree of lower extremity radiculopathy (Tr. 813).  Plaintiff's August, 2013 acknowledgment that she was independent in activities of daily living (presumably requiring significant upper arm and neck use) also supports the RFC crafted by the ALJ (Tr. 941).  An October, 2013 neurological examination was unremarkable (Tr. 898).  As such, the ALJ did not err in declining to include a greater

---

[6]The cited examples do not include all of the records undermining Plaintiff's claim for a more restrictive RFC.  *See* Section II.B, *above,* for an extensive summation of the medical transcript.

degree of upper extremity/neck limitation in the RFC.

## 2. The Use of a Cane

Plaintiff takes issue with the portion of the RFC stating that she required "a cane to ambulate distances greater than 20 yards" *Plaintiff's Brief* at 21-23 (Tr. 174). She argues that none of records support the finding that Plaintiff was capable of walking 20 yards without a cane. *Id.*

As to the lower extremities, the ALJ did not err in declining to find a greater level of restriction (Tr. 174). Plaintiff is correct that none of the records state explicitly that she could walk up to 20 yards without a cane. However, the ALJ did not err in finding that the clinical testing, imaging studies, records containing Plaintiff's description of her own limitations, and her activities of daily living support the finding that she was capable of walking short distances without a cane. In February, 2009, Dr. Eltahawy advised her to walk frequently (Tr. 558). While in May, 2009 and at future appointments, Plaintiff used a cane during examinations by Dr. Eltahawy, it is uncertain whether Dr. Eltahawy endorsed the constant use of a cane on a full-time basis. In December, 2009, he noted that her claims of discomfort stood at odds with the fairly mild imaging studies (Tr. 602). Further, mental health notes from the same month state that Plaintiff denied physical complaints (Tr. 604). A March, 2010 physical examination was normal (Tr. 800). In September, 2010, she exhibited full strength in all extremities and a normal gait, despite her claim that she required a cane (Tr. 738).

The more recent records also undermine Plaintiff's claim that she required a cane for

walking any distance.  In January, 2011, she exhibited full motor strength in all extremities
and normal motor skills (Tr. 738, 1269).  December, 2011 records show full muscle strength
(Tr. 982).  Dr. Eltahawy's April, 2012 finding that Plaintiff's reports of post-operative pain
were unusual, suggest that her professed level of limitation stood at odds with the objective
studies (Tr. 1030).  In August, 2013, Plaintiff reported that she was independent in activities
of daily living (Tr. 941).  Plaintiff's contention that she required a cane on a constant basis
is also undermined by October, 2013 records stating that she was lifting boxes (presumably
with both hands) at the time she sustained an injury (Tr. 880).  Treating records created in
response to the injury showing a normal neurological examination also undermine her claim
that she require a cane at all times (Tr. 898).

### 3.  The  Claims of Disabling Medication Side Effects

Finally, Plaintiff argues that the ALJ erred by failing to take into account the
medication side effects of drowsiness and fatigue in crafting the RFC.  *Plaintiff's Brief* at 24.

Plaintiff is correct that the ALJ must consider possible medication side effects in
assessing whether a claimant is disabled.   20 C.F.R. 404.1529(c)(3).  The ALJ did just that,
noting Plaintiff's allegations that she "was drowsy and dizzy and had poor memory" due to
medication side effects (Tr. 28, 175).  The ALJ nonetheless determined that the record
strongly supported the conclusion Plaintiff's alleged concentrational problems did not prevent
her from performing unskilled work.  She cited September, 2010 consultative records showing
a normal mood and affect and December, 2010 records stating that she was "goal-directed and

orientated" (Tr. 180). The ALJ correctly noted that the mental health treating records showed "fairly unremarkable clinical findings" consistent with the ability to perform "simple, routine work" (Tr. 181). She also noted that Plaintiff's wide range of daily activities, including handling her finances and taking care of her underage daughters supported the finding that she could perform a range of unskilled work (Tr. 182). My own review of the transcript amply supports the ALJ's conclusion that the alleged medication side effects did not preclude unskilled work. As such, Plaintiff's argument that the ALJ was required to both consider *and* adopt the professed limitation of disability due to drowsiness is without merit.

Substantial evidence supports the ALJ's determination. Because the administrative decision was well articulated and within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## VI. CONCLUSION

For the reasons stated above, I recommend that Defendant's motion for summary judgment be GRANTED and that Plaintiff's motion be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th

Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
United States Magistrate Judge

Dated: February 2, 2017

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on February 2, 2017, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager